NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>EDDY LEONEL ORTIZ RAMIREZ<br><br>Defendant. | Criminal Action No. 14-617 (JLL)<br><br>**OPINION** |

**LINARES**, District Judge.

This matter comes before the Court by way of Defendant's motion to suppress his statements to federal agents on July 14 and 15, 2014. The Court has considered the submissions made in support of and in opposition to Defendant's motion, as well as the arguments and evidence presented on the record during the multiple-day evidentiary hearing held in connection with the motion. For the reasons set forth below, Defendant's motion is **granted**.

I. FACTUAL BACKGROUND

At the suppression hearing held on April 8, April 29, and June 10, 2015, the Government presented the testimony of Special Agents Alexandra DeArmas and Mark Novatski of Homeland Security Investigations. Defendant testified on his own behalf and presented the testimony of Task Officer Sergio A. Milan. The evidence entered at the hearing establishes the facts that follow.

Mr. Eddy Leonel Ortiz-Ramirez ("Defendant"), an immigrant from Guatemala, has been in this country since 2003. (Tr. at 175, 177.) He came to the United States from Guatemala to escape "gang extortion" after he "got a bullet to the stomach." (Tr. at 176). He has a high school

education, no criminal record, and a family, including a son born in late June 2014. (Tr. at 175, Def. Br. at 1, Tr. at 177). He had a steady job in construction in 2014, earning twelve dollars an hour. (Tr. at 177.)

      Defendant testified that a Guatemalan individual called him on July 11, 2014 and asked him if he "gave people rides." (Tr. at 178, 204.) Prior to receiving this call, Defendant did not know the person from Guatemala. (Tr. at 179.) This individual then asked Defendant how much he charged to pick people up at the airport. (Tr. at 178.) Defendant agreed to act as a taxi for $150. (*Id.*) He was to drive someone arriving from Guatemala, who turned out to be Victor Arriaza Morales ("Morales"), to an individual from Maryland, who turned out to be Sergio Rodriguez Ochoa ("Ochoa") (Tr. at 178, 89, Def. Ex. 1.) He also testified that he did not know Morales or Ochoa prior to the events of July 14, 2014. (Tr. at 180, 182.)

      At 7:34 p.m. on July 14, 2014, Defendant called the individual in Guatemala and told him he was leaving for the airport. (Tr. at 181.) Soon after, he received a call from Ochoa and went to the airport. At 8:48 p.m. he received a call from his wife, during which she told him that their son "was restless" and "wasn't looking very well." (Tr. at 183, 212.) He told his wife that he would be home as soon as he dropped off Morales. (*Id.*) After his wife called, he received at least four phone calls between 8:51 p.m. and 9:30 p.m. from Ochoa, telling Defendant that he had arrived in Plainfield and asking whether Morales had arrived. (Tr. at 183-184.)

      At 9:42 p.m., he received another call from his wife, during which she told him that "the police [were] there, and that they were going to call the ambulance because [his] son had become gravely ill." (Tr. at 184.) Immediately after that, he called the man from Guatemala and told him that he "wasn't going to pick up the person at the airport because [his] son had become gravely ill, and [he] was going to the hospital." (Tr. at 185.) Though the man from Guatemala was

upset, Defendant told him he was leaving anyway.  (*Id.*)  Immediately after he got off the phone with the man from Guatemala, Ochoa called, begging Defendant to stay in the airport.  (Tr. at 186.)  Despite this, Defendant insisted that he was going to the hospital to see his son.  (*Id.*)  At 9:48 p.m., his wife called him again to tell him that "they were in the ambulance headed to the hospital."  (Tr. at 187.)  At this point, he left the airport, went to his car, and began to drive away.  (*Id.*)

After Defendant had left the airport, gotten back in his car, and begun to drive toward the exit of the airport parking lot, Morales called Defendant under the supervision of Homeland Security Investigations ("HSI") agents.  (Tr. at 187-188, Gov. Br. at 2.)  At approximately 8:35 p.m. that day, Morales had arrived from Guatemala at Newark Liberty International Airport and been arrested by Customs and Border Patrol after a search of his baggage returned 992 grams of cocaine.  (Gov. Br. 1-3.)  During their search of Morales, HSI agents found a scrap of paper with the name "Leonel Mendez" and a phone number.  Morales informed the officers he was supposed to call this number to be picked up.  (*Id.*)  At 10:03 p.m., under supervision by HSI agents, Morales called the number on the scrap of paper.  (*Id.*)  This call was recorded.  (Gov. Br. at 2.)  During this call, Defendant informed Morales that he had "an emergency, [his] son had to go to the hospital" and that he wanted "to go right away."  (Def. Reply Br. at 2.)  Morales begged him to wait, and Defendant told Morales that "children come first."  (*Id.*, Tr. at 189.)  Morales assured Defendant that he would be ready soon, so Defendant agreed to wait for three minutes.  (*Id.* at 3.)  He went back to the airport to wait for him.  (Tr. at 189-190.)

After meeting Morales, the men went to Defendant's car. At approximately 10:15 p.m., before they could get in the car or put the luggage in the car, they were arrested.  (Def. Ex. 1, Tr. at 190.)  Upon his arrest, Defendant signed a consent to search form, allowing law enforcement

3

officers to search his car. (Def. Ex. 6.) He was handcuffed and taken to an office inside the airport. (Tr. at 191.) Defendant testified that he informed the agents that he needed to go to the hospital to see his son. (Tr. at 192.) Special Agent Alexandra DeArmas gave him *Miranda* warnings in Spanish. (Tr. at 23-25). He agreed to waive his rights in order to cooperate with the agents. (Tr. at 27). Defendant testified that he waived his rights and attempted to cooperate because DeArmas, Milan, and Novatski told him that it would be beneficial for him to do so. (Tr. at 193.) He believed that the Agents meant that he would be able to see his wife and ailing child if he cooperated. (Tr. at 193, 198.) The "whole time" he was talking to the agents, his phone was "ringing or buzzing" with calls from his wife and mother-in-law. (Tr. at 195.) He received nearly 70 phone calls and texts from them. (Def. Ex. 8.) Each time the phone rang or he received a text, he would become agitated and repeat "my baby." (Tr. 93, 255-256.) He was teary-eyed, his voice was shaky, and had to be repeatedly reminded to focus on himself instead of his baby. (Tr. at 255, 267, 275.)

Agent DeArmas, who speaks Spanish fluently, interviewed Defendant after his arrest. (Tr. at 10-11.) Agent Novatski and Task Officer Milan also participated in the interview process (Tr. at 21-22.) Defendant testified that DeArmas, Milan, and Novatski told him that he would be able to call his wife when the interview was over, so he continued to cooperate so the interview would end. (Tr. at 200-201.) Agent DeArmas testified that Defendant "was a little upset" and that "he told [the Agents] that he had just learned that his baby had been taken to the hospital . . . [and that] he wanted to speak to his wife." (Tr. at 28.) She also testified that when Defendant talked about his son, "he would get a little more concerned. His voice would get squeaky . . . [and] he would get a little bawled [sic] up . . . [and] his eyes would get a little squinty." (Tr. at 29.) His voice "would get high pitched" and he seemed "upset when he mentioned his baby."

4

(Tr. at 94.) She also testified that "he would get distracted when the phone would ring [and] he would say 'My baby, my baby" and that he "may have teared up." (Tr. at 93-94). Milan also testified that Defendant "seemed a little upset . . . like he had been crying" and that "his eyes were watery." (Tr. at 155-156.) Agent DeArmas admits that she told him "that he could call his wife after we finished the interview, [and] that we would let him make the phone call to his wife to check on the baby." (Tr. at 30.) When Defendant was eventually allowed to talk to his wife at 3:24 a.m. on the morning of July 15, 2014, she told him that his "son's body was purple, that they had put cables all over his body, and that he was still sick." (Tr. at 201-202.)

On July 15, 2014, Defendant was charged by Criminal Complaint with one count of violating 21 U.S.C. § 846, by knowingly and intentionally conspiring and agreeing with Victor Arriaza Morales and others to distribute and to possess with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).  (ECF # 1.)  On October 17, 2014, a grand jury sitting in Newark, New Jersey returned a one-count Indictment against Ortiz-Ramirez.  (ECF # 17.)

On November 17, 2014, Defendant filed a motion to suppress the statements he made to federal agents on July 14 and 15, 2014.  (ECF # 20.)  Because Defendant supplied the Court with an affidavit that raised an issue of fact as to whether Defendant's will was overborne by virtue of the totality of the circumstances existing at the time—*i.e.*, his concern for his newborn son who had been hospitalized moments before his arrest, the constant ringing of his cellular phone during his interrogation without the ability to answer the phone calls from his wife who was at the hospital with his son, his fear and uncertainty as to the status of his son's health, his desire to do anything to satisfy the agents so that they would release him to be with his wife and son at the hospital, and the agent's awareness of the foregoing circumstances during his interrogation, the

5

Court held an evidentiary hearing in connection with Defendant's motion to suppress his statements on April 8, April 29, and June 10, 2015. (ECF ## 30, 31, 33, 38 and 40.)

## II. LEGAL STANDARD

The Fifth Amendment provides, in part, that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court concluded that "without proper safeguards the process of in-custody interrogation . . . contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. The government must take certain steps to protect an individual's Fifth Amendment privilege against self-incrimination, including notifying a suspect interrogated while in police custody that he has the right to remain silent, that any statements he makes may be used against him in court, and that he has the right to have an attorney present at the interrogation. *Thompson v. Keohane*, 516 U.S. 99, 107 (1995); *see also Miranda*, 384 U.S. at 479. A defendant may waive these rights and make a statement, "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. "Whenever the [Government] bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the [Government] need prove waiver only by a preponderance of the evidence." *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

"Only voluntary confessions may be admitted at the trial of guilt or innocence." *United States v. Swint*, 15 F.3d 286, 288-89 (3d Cir. 1994) (citation omitted). In assessing whether a confession was voluntary, the Court must satisfy itself that "the confession was 'the product of an essentially free and unconstrained choice by its maker,' that it was 'the product of a rational

intellect and a free will,' and that the appellant's will was not 'overborne.'" *Swint*, 15 F.3d at 289 (citation omitted).

"Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Connelly*, 479 U.S. at 167.  Both psychological and physical coercion can elicit involuntary confessions.  *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986), *cert. denied*, *Miller v. Neubert*, 479 U.S. 989 (1986).  "The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused."  *Haynes v. Washington*, 373 U.S. 503, 515 (1963).  "To determine the voluntariness of a confession, the court must consider the effect that the totality of the circumstances had upon the will of the defendant."  *Miller*, 796 F.2d at 604.  In evaluating the totality of the circumstances, the Court should consider the age of the accused, his level of education or intelligence, whether he was apprised of his constitutional rights, the length of detention, the nature and circumstances of the questioning, and whether there was use of physical punishment such as food or sleep deprivation.  *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).  The government may use psychological tactics in obtaining a statement from a suspect, but a confession is still considered voluntary as long as the suspect's decision to confess is a "product of the suspect's own balancing of competing considerations."  *Id.* at 605.

### III.     DISCUSSION

Defendant moves to suppress the statements he made after his arrest to law enforcement authorities on July 14 and 15, 2014.  During the interview that followed his arrest, when asked

by the agents what might be in the suitcases that could be illegal, Defendant stated that "it could possibly be cocaine or children's organs, which are sold in Guatemala." (Tr. at 236.) Defendant stated that "he would guess cocaine, if anything" would be the "contraband" in the suitcases. (Tr. at 82.) The Government indicates that Defendant confessed to a role in the conspiracy and to knowing that he was involved in something illegal. (Gov't Br. at 20-22.)

    Defendant argues that the statements he made should be suppressed because they were made involuntarily. Taking into account the totality of the circumstances, his will was overborne, as the agents knew of his overriding concern for his newborn son and used that knowledge to coerce Defendant into cooperating with them. The Government argues that the Defendant's statements were voluntary and made subsequent to a valid *Miranda* waiver. The Government asserts that there is no basis to find that Defendant's statements were coerced, a necessary prerequisite to finding that statements were made involuntarily. The Government also states that there was no intent to coerce Defendant by denying his requests to call his family; instead, the government asserts that agents were following protocol which directs them not to allow suspects to make calls until after they are interviewed, had no way to confirm that Mr. Ortiz-Ramirez's son was actually sick, and were worried that Mr. Ortiz-Ramirez might notify his associates in an attempt to thwart further arrests. (Gov't Br. at 6.) The Government contends that the agents had a duty to balance the law enforcement officers' safety and the integrity of the investigation with Mr. Ortiz-Ramirez's desire to speak with his family, and that this balancing duty has been recognized in a number of other cases. (*Id.*) The Government also points out that although Mr. Ortiz-Ramirez kept receiving calls from his family throughout the interview, he also received many calls from his alleged co-conspirators, which they assert refutes the notion that the phone

8

was left out on the table just to pressure Mr. Ortiz-Ramirez into worrying about his family and answering the agents' questions. (*Id.* at 8.)

As an initial matter, this Court finds that it is undisputed that Defendant was in custody and received adequate *Miranda* warnings. The *Miranda* warnings were administered to Defendant both orally and in written form in Spanish. (Def. Ex. 6.) Defendant initialed each written warning and signed, indicating that he understood his rights. (*Id.*) Two agents, one of whom is bilingual and fluent in Spanish, witnessed this process. (*Id.*)

The question then is whether Defendant voluntarily waived those rights when he made statements to law enforcement agents following his arrest. For the following reasons, the Court finds that the Government has not met its burden of showing by a preponderance of the evidence that Defendant's statements were voluntary. Considering the totality of the circumstances, the Court finds that Defendant's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991).

In considering the totality of the circumstances, the Court has taken into account the relevant facts in the factual background above, including Defendant's age, educational background, lack of a criminal record, work history, his infant's illness on the night of his arrest, the agents' knowledge of the infant's emergency prior to interrogation, and the agents' conduct with respect to his family circumstances. The Court also notes that though Defendant's interview took approximately two hours, beginning at 11:00 p.m., he was not permitted to call his wife until 3:24 a.m., nearly two-and-a-half hours after the interview was completed. (Tr. at 21-22, 201).

The Court finds that the fact that the agents had knowledge from the outset that Defendant's son was ill and being taken to the hospital via ambulance is key. The Government

knew prior to their very first interaction with the Defendant that Defendant was concerned about his child being taken to the hospital and his desire to go there.  They had heard the conversation between Morales and Defendant that Defendant's son was very ill and needed medical care.  They heard this at a time when Defendant had no motive to lie about his son's health as he did not yet know that he was the target of an investigation.  The Government was aware that after Defendant's wife called him at 9:42 p.m. to tell him that the police were at their residence and that they were going to call the ambulance because his son had become "gravely ill," Defendant returned to his car and proceeded to head toward the exit.  The agents who had been observing Defendant at that time saw that he was intending to leave to go to the hospital and directed Morales to call Defendant on his cell to ask Defendant to wait for him.  Based on the evidence presented it is clear to the Court that Mr. Ortiz-Ramirez tried to leave the airport to go see his son and was only induced to stay by Morales's pleas who at that time was working at the behest of the Government.  Furthermore, at the time of the call, Mr. Ortiz-Ramirez did not know that his call was being recorded or that anything was wrong yet.  Nevertheless, he told his passenger that he had to leave to go to the hospital.  The evidence is also clear that at that time and all through the interview he was distraught over his son, who he believed to be in serious peril.  Based on the evidence it is also undisputable that at the time the Government asked the cooperating witness to entice the Defendant to stay they had actual knowledge that Defendant's child was in an ambulance on the way to the hospital after turning purple.

      The Court has carefully analyzed the call log referenced by Defendant during the hearing as Exhibit 8 which clearly indicates that after Defendant was arrested and during his interview, his cell phone buzzed with calls and texts from his wife and mother-in-law nearly 70 times.  The agents, who had the phone in front of them, knew that these calls and texts were coming from

Defendant's wife and mother-in-law.  Both Agent DeArmas and Detective Milan testified that when the Defendant's phone would buzz he would inquire about his son, and would become teary-eyed, his voice would crack and they would remind him to focus on himself.[1]  Defendant continued to ask about his child throughout the interview and asked a number of times if he could call to find out what was happening.  Defendant was not permitted to call until several hours after the interview was concluded.  During the interview, the agents could have called the hospital to check on Defendant's son's status, or double check the veracity of the circumstances regarding the son being taken to the hospital if there was a security concern on their part yet they chose not to do so. Instead, they permitted his phone to sit on the table, buzzing over and over as a constant reminder that his son was ill and his family was trying to reach him.  A reasonable inference can be drawn that this would create a tremendous amount of psychological pressure upon a parent.

At the hearing, Mr. Ortiz-Ramirez testified that he was under the impression that the only way he could leave and go see his son was if he answered the agents' questions.  As Mr. Ortiz-Ramirez understood it, he could only leave to see his son if he talked to the agents, and could only talk to the agents if he waived his rights, therefore he saw no choice but to speak with the agents without counsel.  Mr. Ortiz-Ramirez's dilemma is evidenced by his testimony and the testimony of Agent Novatski, who confirmed that the agents told Mr. Ortiz-Ramirez he had to waive his rights to cooperate. (Tr. 138.)  Mr. Ortiz-Ramirez testified that he "constantly asked to speak to [his] wife in order to find out about [his] son." (Tr. 198.)  Defendant testified that he was told he would be able to speak to his wife when the interview was over.  (Tr. at 201.)  Defendant also testified that Agent DeArmas told him "that if [he] cooperated, she would help

---

[1] The Court found Defendant to be a credible witness, who even at the evidentiary hearing would become upset and begin to cry when speaking of his son's illness that day.

[him] to get out of this." (Tr. at 224-25.) The agents claim that they only told Mr. Ortiz-Ramirez that if he cooperated they would tell the prosecutor he had assisted them. The agents dispute that they ever told Mr. Ortiz-Ramirez that they would "help" him if he cooperated, but given that the agents had to translate their statements to Mr. Ortiz-Ramirez, his urgent desire to get out of the room and go see his son, and his flustered state, it is reasonable to infer from the evidence that Mr. Ortiz-Ramirez believed that the agents would help him in exchange for his cooperation.

The agents' knowledge of Defendant's son's grave illness, coupled with their complete lack of action to verify the situation, and their use of the circumstances during the interview created a coercive environment. The interrogation continued for 2 hours and Defendant's will was overborne by the coercive environment created by the agents. Coercion can take many forms. In this case, the agents knew that Defendant was in fact worried about his baby and Defendant's concern reasonably played a part in his decision to make statements to the agents. His phone was on the table during his interview and constantly buzzed with texts and calls, contributing to elevating his anxiety about his son and thus creating a great deal of pressure on him to speak to the agents. Under the aforesaid circumstances and the unusual facts of this case, the Court finds that Defendant's will was indeed overborne by the coercive nature of the agents' tactics.

At the conclusion of the evidentiary hearing, the Government pointed to four cases in support of their argument that there was no police coercion in the instant case: *United States v. Bowleg*, 567 Fed. Appx. 784 (11th Cir. 2014); *Robertson v. Runnals*, 2008 U.S. Dist. LEXIS 3839 (N.D. Cal.); *United States v. Scott*, 553 Fed. Appx. 555 (6th Cir. 2014); and *United States*

*v. Bronson*, 141 Fed. Appx. 78 (3d Cir. 2005).  For the following reasons, each is factually distinguishable from the facts and circumstances of the case presently before this Court.

The facts presented here are sufficiently dissimilar to *Bowleg* to distinguish the case.  In *Bowleg*, the defendant moved to suppress statements he made while in custody, arguing that he was not read his *Miranda* rights, did not understand the statement he signed, and was coerced into making incriminating statements by agents who told him he could not call his family until he made a statement.  567 Fed. Appx. at 789-90.  Though the Court in *Bowleg* held that "the agents' actions in not permitting [the defendant] to use the phone until he gave a statement were not coercive," the facts of that case are substantially different from the facts before this Court now. *Id.* at 794. The defendant in *Bowleg* had no family emergency requiring him to make a phone call, he only asked to make a phone call once, and he did not do so until after he was read his *Miranda* rights, signed a waiver statement, and told multiple conflicting versions of his story.  *Id.* at 787-88.  In contrast, the facts of the case at bar indicate that there was indeed a medical emergency involving the Defendant's son, the Government was aware of the emergency before beginning the interview and Mr. Ortiz-Ramirez persistently asked the agents to allow him to call his wife and, from the beginning of his interaction with the agents, expressed serious concerns about his baby and trying to contact his family.

In *Robertson*, No. C 05-3103 PJH, 2008 WL 60288 (N.D. Cal. Jan. 3, 2008), the defendant filed a petition for writ of habeas corpus.  In his writ, the defendant claimed, among other things, that "the trial court's denial of his motion to suppress his confession violated his *Fifth* and *Fourteenth Amendment* rights because he had invoked his right to counsel and because his confession was coerced." *Id.* at 3-4. *Robertson* is somewhat similar to the present case because there the defendant "claimed he was not permitted to make any telephone calls to his

13

family or an attorney and was told that he would not be permitted to do so until after he had given a statement." *Id.* at 11.  However, the contested phone access in *Robertson* is central to the defendant's argument that he invoked his right to counsel and was not relevant to the coercion argument.  *Id.* at 17-18. Further, the defendant's coercion claim in *Robertson* was based on his untruthful assertion that he was "deprived of sleep, food, and access to the bathroom and telephone;" he later admitted that he had received food and been allowed to use the telephone. *Id.* at 28-29. Even if the defendant's access to the phone had been limited, he sought to call his wife because she "didn't know where I was at," not because his child was seriously ill, as is the case here. *Id*. at 13.  Nor is there any question here that the medical emergency of the child was not genuine or that it was concocted by the Defendant to buttress his coercion claim.

In *Scott*, 553 F. App'x 555 (6th Cir. 2014), the defendant attempted to suppress his confession by claiming police coercion.  *Id.* at 559.  The defendant claimed "that police coerced him by offering a quid pro quo.  If he gave a statement to police, [the defendant] claims to have been told, he would get food and contact with his family."  *Id.*  The Court found the defendant's statements were voluntary and declined to suppress his statements, however, there are a number of key differences between *Scott* and the present case. *Id.* at 566. First, only the defendant in *Scott* proffered this quid pro quo theory, and "the district court did not credit his testimony on this score."  *Id.*  Second, the defendant's daughter was not gravely ill in *Scott*, as is the case here, and "[the defendant] was not kept incommunicado.  Officer Taylor contacted the mother of [the defendant's] daughter on May 28 to check on the daughter's well-being.  And [defendant] was allowed to call his mother."  *Id.*

Based on the distinct facts of this case and *Bronson*, there is substantial ground to distinguish the instant matter from *Bronson*.  In *Bronson*, 141 F. App'x 78 (3d Cir. 2005), the

14

defendant tried to suppress statements he made to police by "argu[ing] that his actions were involuntary because he was drunk, and because the police coerced cooperation of out of him by promising to let him see his fifteen-year-old daughter . . . if he gave them what they wanted." *Id.* at 79. The court denied the defendant's suppression claim, but unlike in the present case, when the "defendant expressed concern about his daughter; defendant asked that he be allowed to call her, and defendant was allowed to call his daughter on his cell phone." *Id.* In contrast, despite Mr. Ortiz-Ramirez repeatedly expressing concern about his gravely ill baby, the agents did not allow him to call his wife or mother-in-law or attempt to check on the well-being of the child to verify the Defendant's concern and/or allay his fears.

## IV.     CONCLUSION

This Court has carefully weighed the evidence and testimony bearing on the voluntariness of Mr. Ortiz-Ramirez's statements, his knowledge of his rights and his intelligence. The Court finds that at best the evidence regarding whether the Defendant's will was overborne is at equipoise and the Government has failed to meet its burden of a preponderance of the evidence. Therefore, this Court finds that Mr. Ortiz-Ramirez's will was overborne to the extent that he made statements that he otherwise would not have made had it not been for the actions of the Government. *See Swint*, 15 F.3d at 290. The actions of the agents in exploiting the circumstances surrounding the Defendant's child "were so manipulative or coercive that they deprived [Mr. Ortiz-Ramirez] of his ability to make an unconstrained, autonomous decision to confess." *United States v. Walton*, 10 F.3d 1024, 1030 (3d Cir. 1993) (quoting *Miller*, 796 F.2d at 605). Thus, the Court finds that Defendant's decision to make a statement to law enforcement was motivated by law enforcement coercion sufficient to render his statements involuntary.

15

Therefore, any statements made by the Defendant to the agents during the interview must be suppressed.

The Government has failed to meet its burden of proving that Defendant's statements were made voluntarily, by a preponderance of the evidence, therefore, the Court grants Defendant's motion to suppress. An appropriate order accompanies this Opinion.

Dated: July 15, 2015

s/ Jose L. Linares
Jose L. Linares
United States District Judge
